7 N.J. Super. 105 (1950)
72 A.2d 360
BANCROFT REALTY CO., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
STANLEY C. ALENCEWICZ, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1950.
Decided March 22, 1950.
*107 Before Judges JACOBS, EASTWOOD and JAYNE.
Mr. George R. Handler argued the cause for the appellant.
Mr. Jack Prizzia argued the cause for the respondent (Mr. Urban C. Powers, attorney).
The opinion of the court was delivered by JACOBS, S.J.A.D.
This is an appeal from a judgment for the defendant entered in the Hudson County District Court.
The plaintiff instituted dispossess actions against the tenants, including the defendant, of its eight-family dwelling house alleging non-payment of rental of $35 per month. The tenants asserted that the maximum rental under the Housing and Rent Act of 1947 as amended (50 U.S.C.A. App., § 1881 et seq.) was $18 per month, which they tendered. On the other hand, the plaintiff asserted below and now relies upon the contention that its dwelling house was not subject to rent control under the provision of the Act exempting housing accommodations "the construction of which was completed on or after February 1, 1947, or which are housing accommodations created by a change from a nonhousing to a housing use on or after February 1, 1947, or which are additional housing accommodations created by conversion on or after February 1, 1947." 50 U.S.C.A. App., § 1892 (c) (3) (A).
Examination of the quoted language, in the light of the entire Act and its underlying purposes, adequately displays the Congressional intent to encourage new and additional housing by eliminating rent controls therefrom and thus aid in the alleviation of the housing shortage. See Woods v. MacNeil Bros. Co., 80 F. Supp. 920, 923 (D. Mass. 1948). It will be noted that two separate groupings are *108 included within the exemptions. The first relates to "construction" completed after February 1, 1947, and is intended to refer primarily to new houses built after the specified date. The second relates to "change" or "conversion" after February 1, 1947, and is intended to refer primarily to situations where alterations after the specified date to an existing building have changed it from a nonhousing use to a housing use or have increased the number of housing units therein. In the instant matter the plaintiff's building was admittedly not a new house; it had been damaged by fire and was repaired by plaintiff after it purchased the property in the summer of 1947. These repairs simply re-established the identical housing units which had earlier been available; we are satisfied that they did not create a change from a use which was nonhousing in nature to a housing use or increase the number of housing units in the building within the contemplation of the statutory exemptions.
The contention was advanced below that the alterations were so extensive that they resulted in new housing within the statutory reference to "construction" completed after February 1, 1947. Although the Act and the Housing Expediter's formal regulations do not deal with the matter in express terms, there have been pertinent official interpretations. Thus, in a general interpretation issued under date of August 25, 1948 (13 F.R. 5001), the view was expressed that:
"Where a structure which has been damaged by fire or otherwise is repaired or rehabilitated on or after February 1, 1947, a question of fact is presented as to whether new housing accommodations have been created by construction (in which event they would be decontrolled), or whether the previously existing housing accommodations have merely been repaired or rehabilitated (in which event they would not be decontrolled)."
As a guide in determining this question of fact the intra-departmental instruction was given that:
"If the cost of repairs of fire damage is not substantially or materially lower than would have been expended for completely new construction of such units, the area rent director should determine the units to have been newly constructed * * *." *109 For present purposes we shall assume that, in accordance with the general administrative interpretation (Cf. Ford Motor Company v. New Jersey Department of Labor and Industry, etc., 7 N.J. Super. 30 (App. Div. 1950)), the plaintiff's premises were decontrolled if they were so extensively repaired after February 1, 1947, as to result, in a substantial sense, in the new construction of housing units.
The record before us does not contain any of the testimony below but the plaintiff has prosecuted its appeal on the basis of the lower Court's Findings of Fact and Conclusions of Law filed pursuant to Rule 7:13-3; accordingly, we are confined to the facts set forth therein. The sole witness for the plaintiff testified that eighty per cent of the floorings and floor beams on the first floor had been replaced; ceilings, walls and floors in other parts of the building were likewise replaced; new sinks, washtubs and toilets were installed; and, in his opinion, eighty per cent of the building was new. Five witnesses testifying for the tenants controverted this testimony as to the extent of the repairs. They testified in substance that the floors were not new; the original walls, ceilings, woodwork, stairways and window frames remained; and the sinks, washtubs and toilets were mostly the original ones. Recognizing this conflict the Court, at the close of the trial, advised that it would view the premises and neither counsel objected to this action. The Court stated that its examination of the premises revealed that many of the matters, including the extent of the alleged flooring replacement, testified to by the plaintiff's witness were not as represented by him and that the walls, ceilings, woodwork and window frames were, as the tenants' witnesses had testified, not new. It found "as a fact that the premises were not substantially rebuilt by the Plaintiff" and properly concluded that the plaintiff had not brought its dwelling house within the statutory exemptions. See Woods v. MacNeil Bros. Co., supra.
The plaintiff urges that the Court, sitting without a jury, committed error in taking a view of the premises and relying upon its examination. The practice of having a *110 jury view the premises to aid its understanding of the evidence presented in the cause has long been recognized in our State. See Hinners v. Edgewater & Ft. Lee R.R. Co., 75 N.J.L. 514 (E. & A. 1908); State Highway Commission v. Lincoln Terminal Corporation, 110 N.J.L. 190 (E. & A. 1933). No reason has been suggested for denying the same power to a Court sitting without a jury (4 Wigmore, Evidence (3rd Ed. 1940), § 1169; United Cigar Stores Co. v. United Confectioners, 92 N.J. Eq. 56, 58 (Ch. 1920); affirmed, 92 N.J. Eq. 449, 450 (E. & A. 1921)); in any event, the view in the instant matter may be deemed to have been taken with the plaintiff's consent. We do not find, as the plaintiff contends, that the Court's determination improperly rested upon its examination rather than upon the evidence presented in the cause. The several witnesses for the tenants had disputed the plaintiff's witness and had testified, in contradiction, that most of the structure and equipment was not new. An issue of credibility was thus presented. We believe that the record sufficiently indicates that after its examination of the premises and in the light thereof, the Court determined this issue by discrediting the testimony of the plaintiff's witness and accepting the testimony of the tenants. The right to do this and render appropriate judgment thereon has been recognized and, under the particular circumstances presented, any additional findings by the Court would not appear to be material or prejudicial. Cf. Hinners v. Edgewater & Ft. Lee R.R. Co., supra, at p. 519; State Highway Commission v. Lincoln Terminal Corporation, supra, at p. 196. In the Hinners case Justice Garrison, after pointing out that a legitimate use of the view was to understand the testimony, said:
"This being so, it may well follow, as to some testimony, that to understand it is to discredit it, while, as to other testimony, to understand it is to accept it even in the face of contradiction or denial. For instance, if the testimony were that a building was of insignificant size and in a tumble-down condition, and the jury, upon viewing the building, saw that it was of large dimensions and in perfect repair, the testimony that contradicted the jury's observation would go for nothing, not because it had been over-powered by illicit evidence, but simply because it was understood by the jury for what it was worth. Instances may be multiplied in which the jury might *111 properly use its view to check up the testimony adduced by the parties, without any infringement by the jury of the rule that prohibits the importation into the case of outside, or even of inside, information through some other channel than that recognized by the law."
The judgment of the District Court is affirmed.